**CBL & ASSOCIATES, INC., Plaintiff,**

v.

**McCRORY CORPORATION, Defendant.**

**Civ. No. 91–49–ATH(DF).**

United States District Court,
M.D. Georgia,
Athens Division.

April 10, 1991.

John S. Noell, Jr., Athens, Ga., for plaintiff.

Mark Kelley, Kitchens, Kelley, Gaynes, Huprich and Shmerling, Atlanta, Ga., for defendant.

FITZPATRICK, District Judge.

CBL & Associates, Inc., has requested a preliminary injunction, later to be made permanent, to force McCrory Corporation to continue operating its store in the Georgia Square Mall in Athens, Georgia, under the terms of the lease agreement. This case was originally filed in Clarke County Superior Court, but has been removed to this court.

## I. BACKGROUND

CBL owns and operates Georgia Square Mall. By the terms of a twenty year lease signed on October 8, 1980, McCrory agreed to rent a space consisting of 9,306 square feet (out of a total of 687,000 square feet in the entire mall), making it the mall's fifth largest tenant and largest discount variety store. Section 1.1 of the lease provided for an increasing minimum annual rent, presently at $65,142.00, and a percentage rental to be paid if gross sales were higher than given base figures. McCrory has never paid any percentage rent, had gross sales of $869,680.00 in 1988, $801,770.00 in 1989, $682,761.00 in 1990 and has lost $50,000.00 in each of the past two years. Sales for the mall as a whole have increased during this same period.

McCrory decided to close its store in Georgia Square based on its declining sales and losses, due almost certainly to the opening of other discount stores around the mall. A McCrory official spoke with the mall's management about buying out the store's lease, but was told that no amount of money would make this possible. The defendant then advertised a closing sale in local newspapers and placed signs in its store at the mall announcing the sale.

CBL, concerned for its income, the mall's stability and tenant mix, its public image and possible harm to other tenants, filed for a preliminary injunction seeking to enforce the continuous operation clause of the lease, contained at Section 4.3, which provides in relevant part:

> Tenant agrees to ... operate one hundred percent (100%) of the Leased Premises during the entire Term ... with due diligence and efficiency so as to produce all of the Gross Sales which may be produced by such manner of operation. Tenant shall carry at all times in said Leased Premises a stock of merchandise of such size, character and quality as shall be reasonably designed to produce maximum Gross Sales. Tenant shall conduct its business in the Leased Premises at least six (6) days a week, Monday through Saturday, between the hours of 10:00 A.M. and 9:00 P.M., or such additional hours as *Department Stores C & D (Sears and Belk) and 65% of all other Tenants in the shopping center are open for business.*

(Italicized language added by amendment.)

## II. DISCUSSION

CBL has presented an unusual request to the court. It is not especially uncommon for a party to seek an injunction to drive a defendant *out* of business, but here CBL seeks a preliminary, and then permanent, injunction to keep the defendant *in* business. An injunction is an extraordinary remedy, and should not be granted unless good cause is shown. The requirements that CBL must show are: (1) a substantial likelihood that it will prevail on the merits; (2) that it will suffer irreparable harm unless the injunction is granted; (3) that the threatened injury to it outweighs the damage to the opposing party; and (4) that the injunction, if issued, will not be adverse to the public interest. *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352, 1354–55 (11th Cir. 1983).

The plaintiff's case for a preliminary injunction fails upon an examination of the very first factor. CBL has no chance of prevailing on the merits and getting a per-

manent injunction because of the well-settled principle that equity will not order the specific performance of a contract where doing so would require the continuous supervision of the court. McCrory's lease is not due to expire until 2000, meaning that if an injunction were granted, the court would spend the next nine years making certain that the store remains open.

██ Moreover, even if the court were prepared to assume a responsibility of that length, the exact nature of what the court would have to do is unclear. To justify ordering specific performance, the contract must be "definite, certain and clear, and so precise in its terms as to the thing or things to be done by the party whose performance is sought to be compelled that neither party can reasonably misunderstand it." *Martin v. Bohn,* 227 Ga. 660, 182 S.E.2d 428, 430 (1971). The language quoted above from Section 4.3 of the lease gives requirements which are simply too vague to be enforced. The court has neither the time, resources nor the expertise needed to decide whether McCrory is operating with due diligence and efficiency and what mix of products is reasonably designed to produce maximum gross sales. At the hearing, Mr. Randy Thomas, general manager of Georgia Square, stated that if the injunction were granted, it would be his job to make certain that the terms of the lease would be enforced, and suggested that McCrory readopt whatever management strategy it had in 1987 when the store made a profit. This overlooks the obvious fact that if there were ever a disagreement over McCrory's performance it would be this court, not Mr. Thomas, who would have to resolve it. His suggestion that the store return to its previous management methods ignores the effects of the last few years on the marketplace, and is itself vague and unclear.

██ Furthermore, it is not at all clear that CBL will suffer any irreparable harm if an injunction does not issue. In order to establish this element, the plaintiff must show that it has no adequate remedy at law, meaning that the injury must be actual and imminent, not remote and speculative, and requires a remedy of more than money damages. *New York News, Inc. v. New York,* 745 F.Supp. 165 (S.D.N.Y.1990); *La Plaza Defense League v. Kemp,* 742 F.Supp. 792 (S.D.N.Y.1990). The threatened damages claimed by CBL include monetary and non-monetary injuries.

It is no doubt true, as CBL argues, that if McCrory is allowed to leave it will lose the annual rent from the defendant and any possibility of collecting percentage rent. This loss of minimum rent, however, is a purely economic injury, and can be remedied by a suit at law for money damages. Indeed, the evidence suggests that CBL could divide McCrory's space into several smaller stores and actually increase its rental income. The possibility of collecting percentage rent from McCrory is nil. The defendant's gross sales have never risen to the level to justify percentage rent and almost certainly will not do so anytime soon, given the declining sales of the past two years. According to Section 1.1(d) of the lease, McCrory's gross sales would have to top $1,447,600.00 during this, the eleventh year of the lease, for CBL to be entitled to any percentage rent. This figure is more than double the store's gross sales during 1990. Given the recent sales figures and heavy competition surrounding the mall, it is evident that any hope CBL has of collecting percentage rent is unfounded.

CBL has also claimed that the loss of McCrory will decrease the number of customers that come to the mall, and cites a recent survey showing that 7% of people in the building came specifically to shop at McCrory. The plaintiff reasons that other tenants will also be hurt if McCrory is allowed to leave, since stores in a shopping mall are dependent upon one another, and people who come to one store are likely to go to another. No representatives of any of the mall's other tenants were present at the hearing to testify about what harm they might suffer if McCrory were to leave. The court recognizes that some people certainly come to Georgia Square intending to visit the defendant's business and the loss of that store could harm oth-

ers due to the special interdependence of mall businesses. Nonetheless, the drawing power of a store that has lost money for two consecutive years is open to serious question. The evidence suggests that McCrory's drawing power will continue to decline in the future, hinting that other businesses might benefit from a new tenant in the defendant's space.

Additionally, the court notes that CBL's claim of a threat to the stability of Georgia Square is undermined by the fact that McCrory is not an anchor tenant and leases only 1.35% of the mall's leasable square feet. Any damage caused by the loss of McCrory can be mitigated by releasing that space, even if this were to prove difficult. Mr. Thomas' optimistic testimony about the future of the mall, however, leads the court to believe that finding a replacement tenant for McCrory will not prove exceptionally hard.

CBL's request for injunctive relief must therefore be denied on the grounds that this court is unwilling and unable to undertake the continuous and detailed supervision that would be required to enforce it and that the refusal of an injunction would not cause an irreparable injury. There is no need to discuss the other requirements for injunctive relief.

Not surprisingly, case law in this area is scarce and conflicting, but the better-reasoned cases support the denial of an injunction in the case at bar. The leading federal case is *8600 Assoc., Ltd. v. Wearguard Corp.*, 737 F.Supp. 44 (E.D.Mich.1990), in which the defendant clothing store gave notice that it was breaking a ten year lease after two unprofitable years in the plaintiff's shopping center. The defendant occupied 1% of the center's floor space and was not an anchor tenant. The lease specifically stated that the landlord had the right to an injunction if the tenant failed to operate the store as required. The plaintiff, like CBL, argued that it had no adequate remedy at law due to the impossibility of measuring the harm if the defendant's store closed and that the mall would lose customers who would have been attracted by the clothing business and might be perceived as failing.

The court rejected these arguments and refused to grant an injunction, thus following what it termed the majority trend and the modern rule in cases such as this, where "specialized knowledge, skill and judgment is necessarily involved in selecting and investing in inventory, selecting, training and compensating adequate personnel and innumerable other day-to-day business decisions." Moreover, the court noted that the harm to the plaintiff was purely economic, meaning it had an adequate remedy at law, and that there was a real question as to whether the defendant's store could be termed a "draw" since it was losing money, so its closing would do little harm to the mall. *Id.* at 46–47.

An examination of some state cases shows a tendency to deny relief in cases such as this. *Madison Plaza, Inc. v. Shapira Corp.*, 180 Ind.App. 141, 387 N.E.2d 483 (1979), is similar to this case. The tenant occupied a fifth of the plaintiff's shopping center's space, and gave notice of its intent to break a ten year lease after losing money for five years. In listing the harm it would suffer if the defendant were allowed to leave, the plaintiff cited the image of failure an empty store would project, the harm such an image would cause to the recruitment of future tenants, its inability to collect additional percentage rent and the harm to other tenants if the defendant's drawing power were lost.

The lower court denied an injunction on the basis that the defendant had been unable to operate its store profitably and because of the specialized skill and knowledge required to operate such an enterprise and the need for constant supervision. After correctly holding that the mere fact that the defendant had lost money was not sufficient to excuse its breach, the court turned to the second basis of the denial. The plaintiff claimed the lower court's denial was wrong because: (1) the court could merely decree that the defendant operate the store; (2) the defendant, for its own benefit, would make efforts to operate the store more profitably; and (3) if the defen-

dant did not honor the injunction, the plaintiff could file contempt proceedings. After noting that the denial of an injunction was within the trial court's discretion, the court upheld the denial due to the need for constant supervision and despite the plaintiff's claims that it had no adequate remedy at law. 387 N.E.2d at 485–87.

*Grossman v. Wegman's Food Markets, Inc.,* 350 N.Y.S.2d 484, 43 A.D.2d 813 (1973), is also similar. The shopping center tenant, a grocery store, paid a minimum annual rent and an additional 1% of annual gross sales above 10% of the minimum rent. The store had lost money for two years and there was no evidence that the grocery store would ever have sales sufficient to justify paying anything but the minimum rent. There was evidence that the store acted as a draw, and so other tenants would be hurt if it left. Two and a half years into a fifteen year lease, the tenant told the landlord that it was vacating its store. The landlord sued for specific performance and lost because the court recognized that such an order would require judicial supervision over an extended period of time. 350 N.Y.S.2d at 485–86.

In *New Park Forest Assoc. II v. Rogers Enterprises, Inc.,* 195 Ill.App.3d 757, 142 Ill.Dec. 474, 552 N.E.2d 1215 (1990), the owner of a shopping mall sought a temporary restraining order to prevent a tenant from vacating its store. The tenant, a jeweler, had seven years remaining in its lease and had agreed to sell jewelry of "better quality." The trial court denied the request, holding that the plaintiff had an adequate remedy at law in the form of money damages. The appellate court, reasoning that support existed both for and against this basis of the denial, rested its affirmation on the fact that the plaintiff had no substantial likelihood of success on the merits, since a court would almost certainly not order specific performance in such a case because doing so would require prolonged supervision and direction and could involve the court in the business of managing a shopping center. 142 Ill.Dec. at 478–79, 552 N.E.2d at 1219–20. Finally, in *Security Builders, Inc. v. Southwest Drug Co., Inc.,* 244 Miss. 877, 147 So.2d 635 (1962), the court affirmed the refusal of a mandatory injunction requested by a shopping center to keep a drugstore from vacating the premises on the grounds that it would require continuous supervision over a period of years despite the recognition that each business in the shopping center depended on the drawing power of others. 147 So.2d at 638–39.

The similarities between the cases discussed above and this one are obvious. In each case, the court declined to issue an injunction primarily because doing so would require prolonged and detailed supervision of the defendant's business. This is exactly what an injunction in this case would require, and is reason enough in itself to deny the requested relief.

The cases cited by the plaintiff are unpersuasive. In *Dover Shopping Center, Inc. v. Cushman's Sons, Inc.,* 63 N.J.Super. 384, 164 A.2d 785 (1960), the defendant bakery leased a space in the plaintiff's shopping center for an annual minimum rent and a shifting percentage of sales above the minimum figure. After the tenant closed its store for alterations and then gave notice that it would not reopen, the plaintiff sued for an injunction and won. In affirming the lower court's decision, the appellate court noted a provision in the lease specifically giving the landlord the right to an injunction in the event of a breach by a tenant, the difficulty of measuring the plaintiff's damages and the interdependence of merchants in a shopping center.

Significantly, the plaintiff in *Dover* waived any claim to judicial supervision and instead stated that it would rely on the tenant's own self-interest in turning a profit to enforce the court's order. The defendant's objection that the injunction would be too difficult to monitor had no force since the lower court had carefully tailored its order so as to make no direction concerning the method of operating the bakery or the quality of goods sold. 164 A.2d at 790–91.

A denial of an injunction was reversed in *Lincoln Tower Corp. v. Richter's Jewelry*

*Co.*, 152 Fla. 542, 12 So.2d 452 (1943), where the court held that the tenant had an obligation to keep its store open all year despite the difficulty it experienced in finding good employees. The rent was apparently computed solely based on a percentage of the tenant's sales with no minimum figure. The landlord's income thus depended entirely on the tenant's business. The court reasoned that the landlord did not have an adequate remedy at law, since the interdependency of businesses in a shopping center made it impossible to establish the damage to the landlord and the other tenants that would have been done if the defendant had left. 12 So.2d at 453.

*Dover* and *Lincoln Tower* do not convince the court that an injunction is proper in the case at bar. They are both old cases and against the weight of authority. Unlike *Dover*, the plaintiff here has not indicated that it is willing to forego judicial supervision, and the court does not believe that such a concession could be made in any case, since such oversight would be required if a problem were to arise no matter what stipulations were made. The New Jersey court's reliance on the statement in the lower court's decision where

that court said that it made no direction as to the operation of the tenant's business is puzzling, since even if not mentioned in the opinion granting the injunction such supervision could well have been required later. CBL is not as dependent on its tenants doing good business for its income as was the landlord in *Lincoln Tower*, and the general reasoning of that case cannot be accepted for the reasons discussed above.[1]

## III. CONCLUSION

CBL's request for an injunction is DENIED because it would require continuous and detailed supervision by the court and the threat of irreparable injury is not present. This decision is in accord with the more modern and better-reasoned cases, and is fully justified by the facts and the law in the case at bar.

SO ORDERED.

---

**1.** Two cases from Georgia are worthy of mention, although they do not help the plaintiff. In *Evans v. The Grand Union Co.*, 759 F.Supp. 818 (M.D.Ga.1990), the defendant closed its grocery store in the plaintiff's shopping center, prompting a lawsuit. The plaintiff claimed that the lease imposed an express and implied duty of continuous operation, even though it lacked the clear statement of such a duty contained in the leases of other tenants. After a thorough analysis, the court concluded that neither an express nor an implied duty of continuous operation existed. The court in *Piggly Wiggly Southern, Inc. v. Heard*, 197 Ga.App. 656, 399 S.E.2d 244

(1990), held that the tenant had breached an express and implied covenant of continuous operation in its lease, explaining that an implied covenant could be inferred if the parties contemplated that the percentage rent would be substantially greater than the minimum rent. 399 S.E.2d at 246–47.

Although they appear initially similar to this case, *Evans* and *Piggly Wiggly* in fact have no bearing on this decision. The question in those cases was whether a continuous operation duty *existed,* while here the question is whether such a duty, which unquestionably exists, will be *enforced.*